SIERRA CLUB, a non-profit California corporation; Sitka Conservation Society, an unincorporated association; and Carl Lane, Plaintiffs,

v.

Clifford HARDIN, individually, and as Secretary of Agriculture of the United States, Edward P. Cliff, individually, and as Chief, U. S. Forest Service, W. H. Johnson, individually, and as Regional Forester, Region 10, United States Forest Service, Vincent N. Olson, individually, and as Forest Supervisor, North Tongass National Forest, Walter J. Hickel, individually, and as Secretary of Interior of the United States; and U. S. Plywood-Champion Papers, Inc., and the State of Alaska, Defendants.

Civ. No. A–16–70.

United States District Court,
D. Alaska.

March 25, 1971.

As Amended April 6, 1971.

Second Amendment April 8, 1971.

Third Amendment April 16, 1971.

Fourth Amendment May 21, 1971.

Warren W. Matthews, Jr., of Matthews & Dunn, Anchorage, Alaska, for plaintiffs.

Nelson H. Grubbe and Frederick L. Miller, Jr., Washington, D. C., Douglas B. Baily, U. S. Atty., Anchorage, Alaska, for Federal defendants.

Charles K. Cranston, Anchorage, Alaska, for State of Alaska.

Manley B. Strayer and James P. Rogers, of Davies, Biggs, Strayer, Stoel & Boley, Portland, Or., C. Girard Davidson, of Davidson, Engstrom & Henri, Juneau, Alaska, for U. S. Plywood-Champion.

## OPINION

PLUMMER, Chief Judge.

I. Jurisdiction of the Court.

This action was brought to enjoin the sale of timber located in the Tongass National Forest and the patent of national forest land for use in the processing of timber harvested pursuant to an agreement between the United States and U. S. Plywood-Champion Papers, Inc. (hereinafter referred to as U.S.P.). Jurisdiction to review the Secretary of Agriculture's decision is conferred by the Administrative Procedure

Act, 5 U.S.C.A. § 702 (1967),[1] and 28 U.S.C.A. § 1361 (Supp.1970).[2] Jurisdiction under both statutes is without regard to any amount in controversy.[3] Standing of the plaintiffs to challenge the Secretary's actions under these jurisdictional statutes is discussed *infra*.

## II. Parties.

Plaintiff Sierra Club is a non-profit corporation dedicated to the protection and conservation of the natural and scenic resources of the United States, particularly those of the western United States, including the State of Alaska. It is organized and operates under the laws of the State of California, with its principal place of business in San Francisco, California. It has a national membership of approximately 100,000 persons, including 300–400 members in the State of Alaska. The Alaska Chapter has its principal place of business in Anchorage, with organized groups in Juneau, Sitka and Fairbanks. In the Juneau area, adjacent to the timber sale, there are approximately eighty Sierra Club members, many of whom enjoy the timber sale area for scenic and recreational purposes such as hunting, fishing, camping, hiking and canoeing. To a lesser extent, the local members utilize the Berners Bay proposed mill site for similar purposes.

Plaintiff Sitka Conservation Society is an unincorporated affiliate of the Alaska Conservation Society, a state-wide non-profit conservation organization. Its 20–40 members are all residents of the Sitka area, which is, at its closest point, more than 28 miles from the sale area. Like the Juneau members of the Sierra Club, members of the Sitka Conservation Society have on occasion used the proposed sale area and mill site for their personal enjoyment.

Plaintiff Carl Lane is a registered master guide and Sierra Club member who conducts hunting, fishing, sightseeing and photography expeditions for hire into portions of the contract area from his Juneau base of operations. Although he has earned more than $10,000 income in each of the last five years from trips within the sale area, he readily admits that his operations could be shifted should the timber sale be approved.

As the land involved is part of the public domain, none of the plaintiffs has expended any money on improvements in or near the contract area.

Federal defendants, who will be referred to collectively as the "Secretary," include Clifford Hardin, Secretary of the Department of Agriculture, in his capacity as overall administrator of the national forests, Edward P. Cliff, Chief of the Forest Service, who is authorized to make timber sales, W. H. Johnson, Regional Forester for the Alaska Region, which includes the North Tongass National Forest, who is authorized to execute timber sale contracts and related documents, and Vincent N. Olson, Forest

---

1. A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.

2. The district courts shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

3. Plaintiff Carl Lane also alleges federal question jurisdiction under 28 U.S.C.A. § 1331 (1966). Although Lane's testimony that he earned $20,000 within the sale area in each of the past five years as a professional guide is uncontradicted,

Lane admitted on cross-examination that suitable land existed outside the sale area and that the focus of his guiding operations could be shifted without a significant loss of income. In the absence of an allegation that he would be prevented from conducting his guiding business, the value of the right asserted by Lane must be measured by the pecuniary loss to Lane's business, if any, which would follow from the effectuation of the timber sale contract. *Cf.* McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). Since plaintiff Lane admits no such pecuniary loss, the court has no jurisdiction to hear his complaint under 28 U.S.C.A. § 1331 (1966).

Supervisor for the North Tongass National Forest, who is authorized to administer and plan for the use and occupancy of the North Tongass National Forest. Walter J. Hickel, Secretary of the Department of Interior, was also named as a party defendant.

Orders were entered permitting the intervention of U. S. Plywood-Champion Papers, Inc. and the State of Alaska (hereinafter referred to as State), which is the potential recipient of 25 percent of the sale proceeds, as indispensable parties pursuant to Rule 24(a) of the Federal Rules of Civil Procedure.

In response to a motion filed by U.S.P. this case was designated a class action with plaintiffs representing all persons interested in the conservation, preservation and use of the national parks, game refuges, forests, natural and scenic resources and wildernesses, including the air, water, watersheds, wildlife, fish, and all other aesthetic and recreational values of the Tongass National Forest in the State of Alaska. A motion for leave to intervene on behalf of several other conservation groups was denied without prejudice pursuant to Rule 24(a) of the Federal Rules of Civil Procedure on the ground that their interests were fairly and adequately represented by plaintiffs of record.

Amicus curiae briefs were filed by the Alaska Loggers Association, the Alaska Territorial Sportsman, and the City and Borough of Juneau, Alaska.

III. Events leading to the institution of this action.

On or about September 20, 1965, defendant W. H. Johnson, Regional Forester for Region 10 of the United States Forest Service, published in a Juneau newspaper of general circulation public notice of sale of an estimated 8,740,000,-000 undesignated board feet of North Tongass National Forest timber.[4] The notice of sale and related sale documents contained a requirement that the successful bidder install a mill within or adjacent to the sale area for the manufacture of pulp which, together with associated facilities for the manufacture of wood products, should have an annual log requirement of at least 175,000,000 board feet over a fifty year period.

The public sale was held as advertised on December 17, 1965. St. Regis Paper Company was declared the successful bidder and, after posting a $100,000 security deposit, was granted tentative award of the contract. The bid price was $6.54 per thousand board feet for Sitka Spruce and $5.10 per thousand board feet for Western Hemlock, or a weighted average price for all species of $5.65 per thousand board feet.[5] The only other bidder was the corporate

4. The sale is the largest ever conducted by the Forest Service and covers an estimated 1,090,000 acres of land.

5. The final bid was approximately 70 percent above the 1965 Forest Service appraised value calculated according to 16 U.S.C.A. § 476 (1960) which provides that the Secretary of Agriculture
* * * under such rules and regulations as he shall prescribe, may cause to be designated and appraised so much of the dead, matured, or large growth of trees found upon such national forests as may be compatible with the utilization of the forests * * * and may sell the same for not less than the appraised value.
This broad appraisal discretion is amplified in the Department's regulations as follows:

The objective of National Forest timber appraisal is to establish fair market value. The basic procedure will be analytical appraisal under which stumpage value is a residual value determined by subtracting from the selling value of the products normally manufactured from the timber the sum of estimated operating costs, including costs to the purchaser for construction of roads or other developments needed by the purchaser for removal of the timber, and margins for profit and risk. Costs and product values shall be those of an operator of average efficiency * * *. All pertinent factors affecting market value shall be considered including but not limited to prices paid in transactions and valuations established for other purposes for comparable timber. Con-

predecessor of U. S. Plywood-Champion Papers, Inc., which bid an average price of $5.60 per thousand board feet. The bid price was subject to redetermination every five years after July 1, 1971, the date specified in the contract for completion of the processing facilities.

On April 6, 1967, St. Regis Paper Company advised the federal defendants that it would not complete the actions necessary to be granted final award of the contract. Thereafter, on August 17, 1967, the federal defendants made the first of several private offers of the sale contract to U.S.P. Another such offer was made on January 18, 1968, and on February 9, 1968, the federal defendants committed themselves to U.S.P.; the Juneau Unit Sale was subsequently finalized on September 12, 1968. The contract provisions, including the price to be paid for the timber, are identical to the terms offered to St. Regis in 1965, except that the completion date for the mill is now July 1, 1973, and the five-year rate redeterminations called for are likewise advanced to July 1, 1978 and five-year periods thereafter.

No appeal having been taken to the Secretary from the execution of the contract, U.S.P. commenced performance, moving executives and staff personnel to Juneau, the headquarters of a newly formed "Alaska Division." The division, in conjunction with outside technical organizations and engineers, undertook the initial project engineering, setting up schedules for contract commitments and the like. The overhead expense of the Juneau office, including salaries, exceeds $100,000 a month. Up to the time of trial, U.S.P. had spent, or committed itself to spend, more than $3,000,000 in performance of the agreement.

During the period following the execution of the sale agreement, U.S.P. executed a contract with Kanzaki Paper Manufacturing Company, Ltd., of Tokyo, Japan, dated February 18, 1969, which commits U.S.P. to sell, and Kanzaki to buy, all of the output of the pulp mill and sawmill for a period of 15 years from the date of commencement of production.

The first priority of the Alaska Division was selection of a site for the mill required by the contract. Economic factors narrowed the practical consideration to Katlian Bay near Sitka, and Berners Bay—Echo Cove, situated just north of Juneau. On August 11, 1969, U.S.P. appointed a blue-ribbon environmental panel to investigate the impact of the proposed mill on the ecosystems of the two bays. On December 10, 1969 the panel reported that the Berners Bay site was most favorable from an ecological standpoint.[6]

On April 24, 1970, approximately two months after the initiation of this suit challenging the validity of the 1968 timber sale, the Forest Service issued a special use permit to U.S.P. for construction of the mill on 201.22 acres of national forest land at Echo Cove in Berners Bay. The permit was immediately challenged by the plaintiffs in motions for partial summary judgment.[7] U.S.P. subsequent-

---

sideration of such prices and valuation shall recognize and adjust for factors which are not normal market influences. 36 C.F.R. 221.7(a) (1970).

From an average selling price for logs in the Juneau area of $37.21 the Total Production Cost of $30.36 was subtracted, leaving $6.85. To $6.85 adjustments for profit and risk and road construction were made, leaving an indicated advertised rate of $3.25. This final figure was the one used by the Secretary as the base rate for all bids.

6. The Alaska Department of Health and Welfare held public hearings in Juneau

on July 14–15, 1970, to examine the impact of the mill on the ecology of the Berners Bay-Echo Cove area and to facilitate the granting of an Army Corp of Engineers dredging permit. Most of the technical data were presented by either U. S.P. experts or members of the U.S.P. blue-ribbon panel. Aside from indicating the popularity of the proposed plan to operate a pulpmill-sawmill complex at Echo Cove, the hearings added little to the sum total of knowledge already available from U.S.P. sources.

7. One motion was based upon alleged violation of statutory acreage and duration

ly applied for a patent, and on August 13, 1970, was notified that the Secretary of Agriculture had approved the site selection subject to "Conditions of Use" (identical to the restrictions contained in the special permit) pending completion of the mill facility and issuance of the patent.

On February 10, 1970, plaintiffs brought this action to enjoin all further performance under the timber sale contract and for a declaration that the contract is in violation of law, and therefore null and void. Plaintiffs allege that the timber sale and the acts of defendants in association therewith are in excess of statutory authority and constitute an abuse of discretion in the following respects:

A. The timber sale violates 16 U.S.C.A. § 476 (1960) and 36 C.F.R. 221.7 (1970), which require national forest timber to be appraised and sold for not less than fair market value. These provisions are allegedly violated by the following unauthorized acts of defendants which reduced the amount any buyer would pay for the timber:

1. Imposition of a requirement that the purchaser construct at some point within or adjacent to the sale area, a mill or mills for the manufacture of pulp.

2. Imposition of a requirement that logs, cord wood, bolts, and other similar products not be transported for primary manufacture outside the State of Alaska.

B. The timber sale further violates 16 U.S.C.A. § 476 (1960) and 36 C.F.R. 221.8 and 221.10 (1970) because the timber was not sold pursuant to competitive bids at a public auction.

C. The timber sale violates 16 U.S.C.A. § 475 (1960), which limits the purposes for which national forests shall be established and administered, in that the major purpose of the sale is to establish a new industrial enterprise, a substantial portion of the production of which will not be used for the use and necessities of the citizens of the United States.

D. The timber sale violates the provisions of 16 U.S.C.A. §§ 528 and 529 (Supp.1970) (The Multiple Use-Sustained Yield Act) in that the defendants have failed to follow sound sustained yield practices by failing properly to consider and balance outdoor recreation, watershed, wildlife and fish uses with timber requirements.

E. The timber sale violates the provisions of 16 U.S.C.A. §§ 1131–1136 (Supp.1970) (The Wilderness Act) in that the defendants failed to study and classify sufficiently the wilderness qualities of the sale area, and failed to make studies and long-range plans of future public needs and legitimate uses of the Tongass National Forest and the sale area; that by conducting the present timber sale in conjunction with past timber sales the defendants have irrevocably committed themselves to an inflexible schedule of harvesting substantially all of the operable virgin growth forests in Southeastern Alaska to the exclusion of all other legitimate uses of such forests.

F. The timber sale violates 16 U.S.C.A. § 476 (1960) in that the timber to be cut was not designated prior to sale.

G. The issuance of a patent for over 200 acres of national forest land to U. S.P. is unlawful because defendants have no authority to sell lands administered by them in Tongass National Forest.

H. The issuance of the permit and "Conditions of Use" violates, 16 U.S.C.A. § 497 (1960), which limits such permits to 80 acres in area and for a time not in excess of 30 years.

I. Issuance of the permit and "Conditions of Use" is in violation of the mandatory investigation and reporting require-

---

limitations found in 16 U.S.C.A. § 497 (1960) and 48 U.S.C.A. § 341 (1952). The second alleged violations of the National Environmental Policy Act of 1969, 42 U.S.C.A. §§ 4321–4347 (Supp.1971).

These motions, together with defendants' cross-motions for summary judgment, were denied without prejudice. The issues raised are discussed in this opinion, *infra.*

ments of Section 102 of the National Environmental Policy Act of 1969, 42 U.S.C.A. § 4332 (Supp.1971).[8]

## IV. Standing.

At the outset, defendants assert that the Sierra Club and the Sitka Conservation Society do not meet the requirements for standing recently articulated by the Supreme Court in Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

In *Data Processing*, the Court endeavored to clarify the law of standing in general, and in particular § 702 of the Administrative Procedure Act, 5 U.S.C. A. § 702 (1967), which provides:

"A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

The Court held that one seeking standing under this provision must meet two tests: (1) he must show that the challenged action has caused injury in fact, economic or otherwise; (2) the interest sought to be protected must be *arguably* within the zone of interest protected or regulated by a statute or constitutional guarantee.

While the two step analysis was immediately questioned as imposing an additional burden on those seeking to challenge official misconduct,[9] the imprecision of the "arguably within a zone of interest" language makes it probable that the law of standing will remain in limbo until the Supreme Court considers the matter once again.

Indeed, several circuit courts of appeal have indicated that the "zone of interest" requirement does not establish a test separate and apart from the injury in fact requisite.[10] Sierra Club v. Hickel, 433 F.2d 24, 31 (9th Cir. 1970); *cf.* Ballerina Pen Co. v. Kunzig, 433 F.2d 1204 (D.C.Cir. 1970). In light of the Court's observation that "where statutes are concerned, the trend is toward enlargement of the class of people who may protest administrative action," 397 U.S. at 154, 90 S.Ct. at 830, it can only be assumed that the test for standing is *at least* as inclusive as it was prior to the decision in *Data Processing*.[11]

8. Plaintiffs also alleged that the timber sale violates certain Forest Service regulations which prohibit logging activities in steamer lanes, waterfront zones and water influence zones. No finding of fact or conclusions of law were submitted to the court on this issue, and as its resolution is not material to the outcome of the case it is not treated in the opinion that follows.

9. Barlow v. Collins, 397 U.S. 159, 168, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970) (Brennan, J., concurring in result and dissenting).

10. Professor Davis argues that the intent of Congress in enacting § 702 was to create two categories of plaintiffs: (1) those "adversely affected by agency action," or (2) those "aggrieved within the meaning of any statute." Davis, Standing: Taxpayers and Others, 35 U.Chi.L. Rev. 601, 619 (1968). *See also* Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859, 872 (D.C.Cir. 1970):

Thus, in spite of the fact that the Supreme Court has not yet chosen to hold

that the Administrative Procedure Act applies to all situations in which a party who is in fact aggrieved seeks review, regardless of a lack of legal right or specific statutory language, it is clearly the intent of that Act that this should be the case.

11. Defendants argue that this "zone of interests" requirement precludes a suit by a private organization which can allege no injury other than that to the general public in much the same way that the label "public nuisance" prevents suits by private parties whose injuries are not different in kind and degree from those suffered by their fellow citizens.

Professor Davis reasons that a restrictive reading of *Data Processing* and its companion case, Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), such as that suggested by defendants, would be "(1) analytically faulty, (2) contrary to much case law the Supreme Court should not have intended to overrule, (3) cumbersome, inconvenient, and artificial and (4) at variance with

The evolution of standing to protect the public interest, as that concept was generally understood prior to the *Data Processing* decision, is clearly set out in Judge Tamm's scholarly opinion in Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859 (D.C.Cir. 1970). After a careful examination of legislative history and case law, that court concluded that the simple test of standing to sue in the public interest is injury in fact caused by alleged illegality on the part of responsible officials. 424 F.2d at 868.[12]

█ It is generally recognized that the type of injury which will support standing to sue in the public interest need not be economic, but may be "aesthetic, conservational or recreational." Association of Data Processing Service Organizations v. Camp, *supra*, 397 U.S. at 154, 90 S.Ct. 827. In the absence of a more specific pronouncement by the Supreme Court, the analysis of plaintiffs' standing in this case must begin with the Second Circuit decision in Scenic Hudson Preservation Conference v. Federal Power Commission, 354 F.2d 608 (2d Cir. 1965), cert. denied, Consolidated Edison Co. v. Scenic Hudson Preservation Conference, 384 U.S. 941, 86 S.Ct. 1462, 16 L.Ed.2d 540 (1966) (hereinafter referred to as *Scenic Hudson*).

In *Scenic Hudson*, the court considered the standing of several conservation groups to challenge the granting of a Federal Power Commission license to construct a hydroelectric project which would have significantly affected the scenic values of the area in question. The court first examined the statutory guide lines contained in the Commission's licensing power. The applicable portions

of 16 U.S.C.A. § 803(a) (1960) were as follows:

"§ 803. Conditions of license generally.

All licenses issued under sections 792, 793, 795–818, and 820–823 of this title shall be on the following conditions:

\* \* \* \* \* \*

(a) That the project adopted, \* \* shall be such as in the judgment of the Commission will be *best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, for the improvement and utilization of water-power development, and for other beneficial public uses, including recreational purposes;* and if necessary in order to secure such plan the Commission shall have authority to require the modification of any project and of the plans and specifications of the project works before approval."

354 F.2d at 614 (emphasis added by the court).

Having found a congressional intent to protect recreational values, the court then examined the interests of the conservation groups to see if they coincided with the expression of purpose contained in the Commission's authorization and concluded:

"In order to insure that the Federal Power Commission will adequately protect the public interest in the aesthetic, conservational, and recreational aspects of power development, those who by their activities and conduct have exhibited a special interest in such areas, must be held to be included in the class of 'aggrieved' parties under § 313(b)." 354 F.2d at 616.[13]

---

the dominant intent behind the Administrative Procedure Act." Davis, The Liberalized Law of Standing, 37 U.Chi.L.Rev. 450, 457–458 (1970).

12. *See also* Davis, *supra*, note 10 at 621.

13. Although *Scenic Hudson* involved a case arising under the Federal Power Act, which contains an explicit "standing to

review" section, the Supreme Court has held that no such grant is necessary where the litigant can show that he is within the class of persons that the statutory scheme was designed to protect. Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 155, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Hardin v. Kentucky Utilities Co., 390 U.

*For standing purposes* the court did not think it significant that the directive to safeguard aesthetic values was addressed to the Commission or that the implementation of this directive involved an element of judgment or discretion.[14] Similar broad directives contained in the Federal-Aid Highways Act of 1966,[15] the Department of Transportation Act [16] and the Federal Insecticide, Fungicide and Rodenticide Act [17] have been held to support standing on the part of conservation groups. In each instance the language was no more specific than that contained in the Multiple Use-Sustained Yield Act,[18] the Wilderness Act,[19] the National Environmental Policy Act [20] and the Organic Act of 1897,[21] relied upon by plaintiffs in this action.

The increasing liberalization of standing requirements has not gone without criticism, however, and two recent deci-

S. 1, 7, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968). *See* the language of Judge McLean in Road Review League v. Boyd, 270 F.Supp. 650, 661 (S.D.N.Y.1967) : "I see no reason why the word 'aggrieved' should have a different meaning in the Administrative Procedure Act from the meaning given it under the Federal Power Act." [Granting standing to conservation groups to challenge action under the Federal-Aid Highway Act of 1966, 23 U.S.C.A. § 101 et seq. (1966)]. Followed in Citizens Committee for Hudson Valley v. Volpe, 425 F.2d 97, 104 (2d Cir. 1970).

14. *See* discussion of scope of proceedings, *infra*.

15. 23 U.S.C. § 138 (Supp. III, 1965–1967) : "In carrying out the provisions of this title, the Secretary shall use maximum effort to preserve Federal, State, and local government parklands and historic sites and the beauty and historic value of such lands and sites." Standing granted to conservation groups in Road Review League v. Boyd, 270 F.Supp. 650 (S.D.N.Y.1967). The language of the Act was subsequently amended to emphasize the Secretary's discretionary authority. Act of August 23, 1968, Pub.L. No. 90–495, § 18(a), 82 Stat. 823 (1968).

16. 49 U.S.C.A. § 1651(b) (2) (Supp.1970) : "It is hereby declared to be the national policy that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites."
Standing granted to conservation groups in Citizens Committee for Hudson Valley v. Volpe, 425 F.2d 97, 104 (2d Cir. 1970) cert. denied 400 U.S. 949, 91 S.Ct. 237, 27 L.Ed.2d 256 (1971). The grant of standing was also based on a statement in The Hudson River Basin Compact Act, Act of Sept. 26, 1966, P.L. 89–605, 80 Stat. 847 (1966) to the effect that the Hudson River Basin contains resources of "immense economic natural, scenic, historic and recreational value to all the citizens of the United States." 425 F.2d at 105.

17. 7 U.S.C.A. § 135 (1964), as amended, 7 U.S.C.A. § 135 (Supp.1970). *See* Environmental Defense Fund, Inc. v. Hardin, 428 F.2d 1093, 1095, n. 2 (D.C.Cir. 1970).

18. 16 U.S.C.A. § 528 (Supp.1970) : "It is the policy of the Congress that the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes." Standing of conservation groups recognized in Parker v. United States, 307 F.Supp. 685 (D.Colo.1969) ; Gandt v. Hardin, Civil No. 1334 (W.D. Mich., filed December 11, 1969).

19. 16 U.S.C.A. § 1131(a) (Supp.1970) :
In order to assure that an increasing population, accompanied by expanding settlement and growing mechanization, does not occupy and modify all areas within the United States and its possessions, leaving no lands designated for preservation and protection in their natural condition, it is hereby declared to be the policy of the Congress to secure for the American people of present and future generations the benefits of an enduring resource of wilderness.
Standing of conservation groups recognized in Izaak Walton League of America v. St. Clair, 313 F.Supp. 1312 (D. Minn.1970) ; Parker v. United States, 307 F.Supp. 685 (D.Colo.1969).

20. 42 U.S.C.A. § 4331(c) (Supp.1971) : "The Congress recognizes that each person should enjoy a healthful environment * * *." Standing of conservation groups recognized in Pennsylvania Environmental Council, Inc. v. Bartlett, 315 F.Supp. 238 (M.D.Penn.1970).

21. 16 U.S.C.A. § 475 (1960) :
No national forest shall be established, *except to improve and protect the forest* within the boundaries, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States * * *.

sions in this circuit have imposed stringent qualifications upon conservation groups seeking to challenge the administration of public lands.

In Sierra Club v. Hickel, *supra,* the court acknowledged that a party might be "aggrieved" within the meaning of the Administrative Procedure Act without suffering economic injury, but nevertheless held that the Sierra Club, in challenging permits granted by the Secretary of Interior to Walt Disney Productions for the purpose of developing a ski resort in the remote Mineral King area of Northern California, had failed to sufficiently allege injury to a "direct and obvious interest." 433 F.2d at 32–33. Noting that "There is no allegation in the complaint that members of the Sierra Club would be affected by the actions of [the Secretary] other than the fact that the actions are personally displeasing or distasteful to them," the court distinguished two cases in which the Sierra Club had been granted standing, Citizens Committee for Hudson Valley v. Volpe, 425 F.2d 97 (2d Cir. 1970) and Parker v. United States, 307 F.Supp. 685 (D.Colo.1969); on the ground that in those cases the Sierra Club "was joined by local conservationist organizations made up of local residents and users of the area affected by the administrative action." 433 F.2d at 33.

A second significant restriction was imposed upon conservation organizations in Alameda Conservation Association v. State of California, 437 F.2d 1087 (9th Cir. 1971). The Alameda Conservation Association and eight of its members, four of whom owned property adjacent to San Francisco Bay, attempted to prevent further land fill operations which would contract the outline of the Bay. While a majority of the court upheld the standing of all individual plaintiffs (including those who did not live on the Bay), two members held that the conservation organization lacked standing to assert the rights of its members. Judge Trask, writing for the majority denying standing to the organization, reasoned that no rights of the corporate organization, as opposed to its constituents in the aggregate, were endangered. Judge Merrill, in a separate opinion concurring in the result, placed great emphasis on the fact that the individual members would not be bound by a judgment against the association. He reserved his judgment on the propriety of allowing a corporate association to represent the interests of its followers in situations where all the members would be bound by a judgment against the corporation, suggesting that in "appropriate circumstances, an organization which is likely to be a vigorous party in the presentation of its case and which can demonstrate express authorization of its members should be able to represent its members' interests for litigation." 437 F.2d at 1098, n. 2, Judge Hamley, dissenting on this issue, reasoned that in light of the elimination of the "legal interest" requirement for standing the Association should have standing to represent its members.[22] Thus, the standing of conservation societies to represent the interests of their members in situations where the possibility of inconsistent verdicts has been foreclosed was left undecided.

■ The threat of harassment through consecutive lawsuits was effectively foreclosed in this litigation by the court's order designating this suit a class action. Although the individual members have not formally authorized their respective organizations to prosecute this action in their names, there was no opposition to U.S.P.'s motion and in the absence of any requests to be excluded under Rule 23(c)(2) all members are bound by the decision of this court.

The policy reasons for permitting the conservation groups to represent the interests of their members in a class ac-

22. *Accord,* Environmental Defense Fund, Inc. v. Hardin, 428 F.2d 1093, 1097 (D.C. Cir. 1970) ; Citizens Ass'n of Georgetown v. Simonson, 131 U.S.App.D.C. 152, 403 F.2d 175, 176 (1968).

tion are compelling. Any other rule would have the practical effect of preempting many meritorious actions, as one individual, or a small number of individuals, would have to sustain the entire financial burden of the lawsuit. Even if the action is brought pursuant to Rule 23, costs could only be assessed if the plaintiff was successful. The fact that a victory in suits of this nature usually does not result in an award of damages means that even if successful the attorney who initiates the suit will probably have to look to the parties of record for reimbursement. Few members of the general public will have the resources or courage to face such odds for the sake of vindicating a right to which all are entitled as a matter of law.

■ The only question remaining is whether the conservation society has a sufficient interest in the outcome of this proceeding to satisfy the case and controversy clause of Article III—whether the Sierra Club and Sitka Conservation Society have alleged a "direct and obvious" injury within the meaning of Sierra Club v. Hickel, *supra*. Testimony at the hearing indicated that the aesthetic, recreational and conservational interests of local members of both organizations who utilize and enjoy the sale area are directly affected by the Secretary's decision. The majority opinion in Alameda Conservation Association v. California, *supra*, which granted standing to plaintiffs residing up to six miles away from the portions of the bay threatened by land fill, makes it clear that the injury need not result in destruction of property values to justify standing. Under the circumstances of this case, Sierra Club and the Sitka Conservation Society have standing to assert the aesthetic conservational and recreational interests of local members and users who are directly affected by the timber sale and proposed pulp mill complex.

The spectre raised by the defendants of intransigent national conservation organizations usurping the policy functions of elected and appointed officials ignores the fact that plaintiffs in this case have alleged violations of statutory provisions. The need to safeguard legitimate exercises of discretion is more adequately met by the doctrine of nonreviewability, which is discussed in greater detail in another portion of this opinion.[23] The doctrine of standing was never intended to provide a shield for official illegality.

Standing to challenge the sale and permit under acts which clearly evince an intent on the part of Congress to promote "aesthetic, conservational and recreational" interests, however, does not necessarily imply standing to challenge other aspects of the transactions under statutes which merely reflect a general intent to protect the citizen in his capacity as a taxpayer. Thus, while plaintiffs clearly have standing under the Multiple Use-Sustained Yield Act, 16 U.S.C.A. §§ 528 and 529 (Supp.1970), the Wilderness Act, 16 U.S.C.A. §§ 1131–1136 (Supp. 1970), The National Environmental Policy Act of 1969, 42 U.S.C.A. §§ 4321–4347 (Supp.1971), and other acts relating to the administration of the national forests which express a congressional concern for aesthetic, recreational or conservational values, standing to challenge the sufficiency of the consideration given for the sale is questionable. If the appraisal and bidding requirements of 16 U.S.C.A. § 476 (1960) are viewed as mere fiscal safeguards to insure adequate financial return on the sale of public assets, then plaintiffs lack standing to question the procedures employed by the Secretary. Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). If, on the other hand, the administration of the national forests for multiple use and sustained yield is seen as a function, *inter alia*, of the price which the Forest Service demands and is able to realize for public timber, then it is much more difficult to conclude that any alleged illegality in bidding and appraisal practices had no impact upon "aesthetic, conservational and recreational" values. Given the

23. *See* Davis, *supra*, notes 10 and 11.

strong presumption in favor of judicial review, Abbott Laboratories v. Gardner, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), and the importance of the issues involved, a ruling will be made on the merits, despite some reservations on the issue of standing. *Cf.* National Association of Securities Dealers, Inc. v. Securities and Exchange Commission, 136 U.S.App.D.C. 241, 420 F.2d 83, 102–103 (1969) (concurring opinion of Circuit Judge Burger), cert. granted sub nom. Investment Company Institute v. Camp, 397 U.S. 986, 90 S.Ct. 1114, 25 L.Ed.2d 394 (1970).

V. Reviewability of the Secretary's actions.

The function of the law of standing is to insure that proper plaintiffs are before the court. The doctrine of non-reviewability of discretionary functions, codified in section 701 of the Administrative Procedures Act,[24] (hereinafter referred to as A.P.A.), is designed to insure that the orderly conduct of official business is not needlessly fettered by individuals who disagree with the policy orientation of the incumbent administration.

■ For purposes of reviewability, statutes are classified as either "mandatory" or "permissive." If the Secretary has the ultimate discretion to re-fuse to act even if all other statutory requirements are met, the statute is permissive and review is precluded.[25] Conversely, if the Secretary's discretion is limited to deciding whether the statutory requirements have been met, the statute is mandatory and the court has jurisdiction to hear a claim by an aggrieved party under the A.P.A. Ferry v. Udall, 336 F.2d 706 (9th Cir. 1964).

Where the statute is mandatory in its terms but leaves the Secretary great latitude in administration "[T]he question is not *whether* agency action is by law committed to agency discretion but *to what extent* agency action is so committed." 4 K. Davis, Administrative Law Treatise 33 (1958) (Emphasis added). Medical Committee for Human Rights v. Securities and Exchange Commission, 432 F.2d 659, 673 (D.C.Cir. 1970); Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859, 874 (D.C.Cir. 1970).

■ Statutes bestowing discretion on a federal official are not passed in a vacuum. They may contemplate a broad range of permissible decisions, but the outer boundaries of the decision making process are circumscribed by the statutory framework of the program administered by the agency. Indeed, were this not so, the delegation of authority would be impermissibly broad. Decisions may not be based upon factors irrelevant to

---

24. 5 U.S.C.A. § 701(a) (2) (1967) exempts "agency action * * * committed to agency discretion by law" from the review provisions of the A.P.A. *But see* 5 U.S.C.A. § 706(2) (A) (1967), which requires the court to set aside agency action which is "arbitrary, capricious, *an abuse of discretion,* or otherwise not in accordance with law." (Emphasis added).

25. The Supreme Court has recently noted that the exception from review contained in § 701(a) (2) of the A.P.A. is "very narrow" and is relevant only where there is "no law to apply." Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).
    Examples of statutes which have been found to be permissive in this circuit are the Isolated Tracts Act, 43 U.S.C.A. § 1171 et seq. (1964), Ferry v. Udall, 336 F.2d 706 (9th Cir. 1964); the Taylor Grazing Act, 43 U.S.C.A. § 315 et seq. (1964); Sellas v. Kirk, 200 F.2d 217 (9th Cir. 1952), cert. denied, 345 U.S. 940, 73 S.Ct. 831, 97 L.Ed. 1366 (1953); Mollohan v. Gray, 413 F.2d 349 (9th Cir. 1969); the Mining Claims Occupancy Act, 30 U.S.C.A. § 701, et seq. (1971), United States v. Walker, 409 F.2d 477 (9th Cir. 1969) and the Small Tracts Act, 43 U.S.C. 682a et seq. (1964), Lutzenhiser v. Udall, 432 F.2d 328 (9th Cir. 1970).
    Under each of these statutes the Secretary ultimately has discretion to refuse to classify public land without reference to the qualifications of those who apply to use or obtain a patent to the land.

the purposes of the statutory scheme, nor may factors relevant to the express congressional purpose be totally ignored. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). See Sapherstein, Nonreviewability: A Functional Analysis of "Committed to Agency Discretion," 82 Harv.L.Rev. 367: L. Jaffe, Judicial Control of Administrative Action, 181 (abridged student ed. 1965).

As the District of Columbia Circuit recently noted:

"[I]t is incontestable that many many areas of government contracting are properly left to administrative discretion; the courts will not invade the domain of this discretion, but neither can the agency or official be allowed to exceed the legal perimeters thereof. Contracting officials can exercise discretion upon a broad range of issues confronting them; they may not, however, opt to act illegally. When the bounds of discretion give way to the stricter boundaries of law, administrative discretion gives way to judicial review." Scanwell Laboratories, Inc. v. Shaffer, supra, 424 F.2d at 874.

█ The Secretary's actions in this case are challenged under mandatory type statutes which require him either to consider certain factors in the administration of the national forests or to comply with certain procedures when dis-posing of the public domain. While the standards may be broad, they nevertheless are mandatory. The fact that the management of the national forests under these statutes inevitably involves a substantial amount of discretion in interpreting these directives does not preclude the possibility of review. Ferry v. Udall, 336 F.2d 706, 711 (9th Cir. 1964).[26] The scope of review was limited, however, to the question of whether or not the Secretary had complied with the mandatory procedures required by the relevant statutes. Where the final decision was dependent upon the relative weight to be given the prescribed decisional imputs and no standard was suggested by the statute, the court treated the outcome as "committed to agency discretion" within the meaning of section 701 of the A.P.A. and refused to substitute its judgment for that of the administrator absent a clear showing that his discretion had been abused.

## VI.  Scope of the hearing.

█ The review contemplated by section 706 of the A.P.A., 5 U.S.C.A. § 706 (1967), is review of the administrative record and not a de novo judicial proceeding.

Plaintiffs argue forcefully that the review provisions of the A.P.A. are inapplicable to informal agency action where no hearings have been held.[27]  Several

---

26. See Parker v. United States, 307 F. Supp. 685, 688 (D.Colo.1969) (holding that the court had jurisdiction to review whether or not the Secretary had given due consideration to various competing uses under the Multiple Use-Sustained Yield Act). Accord, Dorothy Thomas Foundation, Inc. v. Hardin, 317 F.Supp. 1072 (W.D.N.C.1970); Gandt v. Hardin, Civil No. 1334 (W.D.Mich. filed December 11, 1969).

27. There is some support for this construction in the language of the A.P.A. Only three sections of the Act refer to a "record." Section 556 refers to the record as the basis for decision in hearings required by § 553 (rule making) and § 554 (formal adjudications). Section 556(d) gives a party to such a proceeding the right to a full presenta-tion of his case, including cross-examination, if necessary. The "exclusive record" is defined by § 556(e) as "The transcript of testimony and exhibits, together with all papers and requests filed in the proceeding * * *." Section 557 describes the process of administrative review by the agency, also in cases where a hearing is required by § 556 (§§ 553 and 554); Section 706 refers to judicial review of the whole record. Cf. O'Dwyer v. Commissioner of Int. Rev., 266 F.2d 575, 580 (4th Cir. 1959).

In Jones v. Freeman, 400 F.2d 383 (8th Cir. 1968), the court states that aggrieved parties are "entitled to a trial de novo if there is no administrative hearing." (400 F.2d at 390). The court, however, could not have been referring to a trial de novo where the court makes a judgment of

cases support the proposition that where no hearing is required by administrative procedures trial *de novo* in the reviewing court may be appropriate. Southern Garment Manufacturers Association v. Fleming, 74 App.D.C. 228, 122 F.2d 622, 632 (1941); New Hampshire Fire Insurance Co. v. Murray, 105 F.2d 212, 217 (7th Cir. 1939.) [28] Plaintiffs also point to several conservation cases in which the scope of review was never discussed but trial *de novo* was evidently permitted. Citizens Committee for Hudson Valley v. Volpe, 425 F.2d 97 (2d Cir. 1970) cert. denied 400 U.S. 949, 91 S.Ct. 237, 27 L.Ed.2d 256 (1971); Parker v. United States, 309 F.Supp. 593 (D.Colo. 1970).[29]

These cases, insofar as they imply that the reviewing court may substitute its own judgment for that of an administrator acting *ex parte*, are distinguishable from the instant case in which an administrative appeal was available but not pursued by the plaintiffs.[30] The

Ninth Circuit has consistently held that where issues have been presented in an administrative hearing trial *de novo* may not be permitted by the reviewing court. Coleman v. United States, 363 F.2d 190 (9th Cir. 1966); Dredge Corp. v. Penny, 338 F.2d 456, 460–461 (9th Cir. 1964); Adams v. United States, 318 F.2d 861 (9th Cir. 1963); Standard Oil Co. v. United States, 107 F.2d 402, 409 (9th Cir. 1939), cert. denied 309 U.S. 654, 60 S.Ct. 469, 84 L.Ed. 1003 (1939). Permitting trial *de novo* in this case would reward plaintiffs for their failure to exhaust their administrative remedies with a judicial review broader in scope than that allowed those who follow established procedures.

Although the court is not at liberty to make a *de novo* determination, it need not limit itself to the *ex parte* record compiled by the Secretary. Brown v. United States, 396 F.2d 989, 993–994, 184 Ct.Cl. 501 (1968); L. Jaffe, *supra*, at 187.[31] Where a determination has

first impression applying its own standards of proof, assumptions, *etc.* The only case cited for the court's statement is Jordan v. American Eagle Fire Ins. Co., 83 U.S.App.D.C. 192, 169 F.2d 281 (1948). That case involved review of a District of Columbia agency decision; the applicability of the A.P.A. was not in issue. The court held that where a hearing would be required by due process it is not essential that the hearing be granted at the agency level—"it may be adequately supplied by a judicial proceeding in which new evidence may be supplied and full opportunity afforded for exploration of the bases of the disputed order." 169 F.2d at 289. The court did not comment on the weight that should be given to the agency determination. Moreover, the court implied that *de novo* fact finding is inappropriate within the sphere of determinations made pursuant to a lawful exercise of discretion:

Judicial review under a statute authorizing agency action is not precluded because some of that action may be "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Rather, judicial review is precluded only to the extent that such discretion exists. Davis, Unreviewable Administrative Action, 15 F.R.D. 411, 428 (1954).

28. While allowing trial *de novo*, the court nevertheless held that administrative findings were entitled to a presumption of "prima facie correctness." 105 F.2d at 217.

29. It is difficult to ascertain the extent to which new evidence was admitted in Citizens Committee for Hudson Valley v. Volpe. The court states that the issue of *statutory construction* is subject to full review, 425 F.2d at 101, but the court seems to indicate in its brief discussion of the merits that the court would be reluctant to engage in *de novo* fact finding where a decision has been committed to agency discretion. 425 F.2d at 106–107. Trial *de novo* was clearly allowed in Parker v. United States, but the court explicitly held that the issue was primarily one of law and that the intent of Congress was to *deprive* the Secretary of Agriculture of his discretion to make the determination in question.

30. Plaintiffs' failure to exhaust their administrative remedies is discussed in greater detail, *infra*.

31. The admission of *de novo* evidence in no way relieves plaintiffs of the onerous burden of overcoming the presumption of administrative regularity. The court must still uphold a decision based upon sub-

been made *ex parte*, the only way in which a court can determine whether it is supported by substantial evidence is by evaluating it in light of all the evidence which was available to the Secretary, not simply the evidence recited by the Secretary in support of his formal decision.[32] The Supreme Court has recently noted that where no formal hearing has been held:

"[R]eview is to be based on the full administrative record that was before the Secretary at the time he made his decision. But since the bare record may not disclose the factors that were considered or the Secretary's construction of the evidence it may be necessary for the District Court to require some explanation in order to determine if the Secretary acted within the scope of his authority and if the Secretary's action was justifiable under the applicable standard."

Citizens & Preserve Overton Park, Inc. v. Volpe, 401 U.S. 420, 91 S.Ct. at 825, 28 L.Ed.2d 136 (1971).

Accordingly, issues of fact related to mandatory statutory provisions were evaluated in the light of the "whole record," including such evidence as was available to the Forest Service and which fairly detracted from its decision. Where the record presented to the court was found to be inadequate, oral testimony was admitted to show the following: (a) Whether the Secretary did not in fact consider relevant factors which it was obliged to consider by law; (b) Whether the Secretary in fact gave weight to any irrelevant factors which should not have been considered.[33] Objections were sustained, however, to expert testimony offered to controvert the discretionary decisions of the Secretary based upon relevant facts not in dispute. Even in this area substantial evidence was heard as offers of proof pursuant to Rule 43 in the interest of providing an adequate record for review.[34]

All issues presented for decision were fully litigated and a complete record was compiled sufficient to permit disposal of this case without retrial in the event the conclusions of this court should be disapproved upon appeal. Cold Metal Process Co. v. E. W. Bliss Co., 285 F.2d 231 (6th Cir. 1960); F. H. McGraw & Co. v. Milcor Steel Co., 149 F.2d 301, 306 (2d Cir. 1945); Railroad Companies v. Schutte, 103 U.S. 118, 143, 26 L.Ed. 327 (1880).

VII. Exhaustion of remedies.

■ Plaintiffs admit that they had contemporaneous knowledge of all major actions taken pursuant to the timber sale, including the 1965 sale to St. Regis, the Forest Service decision to offer the

stantial evidence *even if it would have reached a different decision were the trial de novo.*

32. Noren v. Beck, 199 F.Supp. 708 (S.D. Cal.1961), in which the court limited the scope of review to the departmental record, despite the plaintiff's protestations that no formal record existed, does not dictate a different result. That case involved a request for classification of public lands under a permissive statute. The Secretary's decision was accordingly not reviewable on *any* record. *See* note 26 *supra. See also* Hall v. Hickel, 305 F. Supp. 723 (D.Nev.1969); Daniels v. United States, 247 F.Supp. 193 (W.D. Okla.1965).

33. Compare Ainsworth v. Finch, 437 F.2d 446 (9th Cir. 1971): "If, based upon the record as a whole, the Secretary's conclusions are rational, 'they must be upheld; but if, for example, reliance has been placed upon one portion of the record to the disregard of overwhelming evidence to the contrary, the courts are equally bound to decide against the Secretary.'" [*Citing* Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964).]

34. Trial *de novo* was held to determine the issues of standing, laches, and whether the granting of the mill site permit was a major federal action under the NEPA. As to these issues the fact that some of the evidence introduced by the federal defendants was obtained from the documents found in the administrative record raised no presumption as to its validity and was subject to refutation by any competent evidence offered by the plaintiffs.

contract to U.S.P. and U.S.P.'s acceptance in 1968 and U.S.P.'s selection of the Echo Cove mill site in 1969. The Sierra Club is acquainted with Forest Service protest and administrative review procedures, having previously employed them in cases similar to the one at bar. No satisfactory explanation has been offered for the plaintiffs' failure to file an administrative protest prior to instituting this action on February 10, 1970.

The policies underlying the doctrine of exhaustion of administrative remedies were recently set forth by the Supreme Court in McKart v. United States, 395 U.S. 185, 194–195, 89 S.Ct. 1657, 1663, 23 L.Ed.2d 194 (1969):

"*  *  * The administrative agency is created as a separate entity and invested with certain powers and duties. The courts ordinarily should not interfere with an agency until it has completed its action, or else has clearly exceeded its jurisdiction. As Professor Jaffe puts it, '[t]he exhaustion doctrine is, therefore, an expression of executive and administrative autonomy.' This reason is particularly pertinent where the function of the agency and the particular decision sought to be reviewed involve exercise of discretionary powers granted the agency by Congress, or require application of special expertise.

"*  *  * Particularly, judicial review may be hindered by the failure of the litigant to allow the agency to make a factual record, or to exercise its discretion or apply its expertise. In addition, other justifications for requiring exhaustion in cases of this sort have nothing to do with the dangers of interruption of the administrative process. Certain very practical notions of judicial efficiency come into play as well. A complaining party may be successful in vindicating his rights in the administrative process. If he is required to pursue his administrative remedies, the courts may never have to intervene. And notions of administrative autonomy require that the agency be given a chance to discover and correct its own errors. Finally, it is possible that frequent and deliberate flouting of administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its procedures."

Although McKart upheld judicial review of a conviction for failing to report for induction where the decision of the local board was not appealed to the Director of the Selective Service, the decision has been limited to exceptional cases where the defense involves a narrow legal question of statutory interpretation and the application of administrative expertise is therefore not critical. Lockhart v. United States, 420 F.2d 1143 (9th Cir. 1969). Even this limited exception to the doctrine may be inapplicable where the plaintiff has completely failed to seek *any* administrative remedy prior to judicial review. The Ninth Circuit has held that failure to *seek* an administrative remedy prior to filing an action for judicial review deprives the district court of jurisdiction, presumably on the theory that the administrative agency had primary jurisdiction.[35] United States v. Hart, 433 F.2d 950 (9th Cir. 1970); Hills v. Eisenhart, 256 F.2d 609, 611 (9th Cir. 1958). The potential for litigious interruption of orderly administrative procedures is certainly greater where plaintiff has not even bothered to obtain an initial determination by the administrative agency. *See* McKart v. United States, *supra,* 395 U.S. at 202, 89 S.Ct. 1657, 23 L.Ed.2d 194.

35. The concept of "primary jurisdiction" is closely related to the exhaustion doctrine. The Supreme Court described the doctrine in Aircraft and Diesel Equipment Corp. v. Hirsch, 331 U.S. 752, 767, 67 S.Ct. 1493, 1500, 91 L.Ed. 1796 (1947): "The very purpose of providing either an exclusive or an initial and preliminary administrative determination is to secure the administrative judgment either, in the one case, in substitution for judicial decision or, in the other, as foundation for or perchance to make unnecessary later judicial proceedings."

Plaintiffs contend that where the administrative remedy is clearly inadequate they should not be obliged to exhaust it.[36] Although they had a right to appeal any of the above mentioned Forest Service actions to the Secretary, they argue that such an appeal would be meaningless because the Secretary need not order a hearing, 36 C.F.R. § 211.28 (c) (1970), and in any event discovery would not be available even if a hearing were held. 36 C.F.R. § 211.101 (1970).[37] Plaintiff's argument places too much emphasis upon the first function of the exhaustion doctrine—i. e. articulation of a coherent administrative record as a foundation for judicial review.[38] It ignores the equally important function of preserving the integrity of the administrative process by giving the administrative agency an opportunity to consider objections in the first instance and by giving the Secretary an opportunity to overturn an erroneous decision of his subordinates. In any event, this court is not at liberty to speculate as to probable actions of the Secretary in an appeal that was never taken. Spanish International Broadcasting Co. v. Federal Communication Commission, 128 U.S.App.D.C. 93, 385 F.2d 615, 626 (1966); Hills v. Eisenhart, *supra*.

Plaintiffs have completely ignored established administrative procedures which could have obviated the need for review by this court, or which in the alternative could have provided a meaningful record that would have vastly simplified this proceeding. Their claims, with the exception of the cause of action based upon violations of the National Environmental Policy Act of 1969, are accordingly barred.[38a]

---

36. *Cf.* Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859, 875-876 (D.C.Cir. 1970).

37. The Secretary's regulations create three classes of appeals. 36 C.F.R. 211.20 (1970). The first two involve government actions which breach a contract or interfere with existing contractual rights. In these cases appeal to the Board of Forest Appeals is a matter of right and subpart C makes provision for formal hearings. Appeals from all other decisions are classed as "Class Three" appeals which go directly to the Secretary, who must make a written decision based upon the record supplied by the Chief of the Forest Service. 36 C.F.R. §§ 211.27(c), 211.28 (c). 36 C.F.R. § 211.101 exempts Class Three appeals from the safeguards of Subpart C, and the Secretary is under no obligation to hold a public hearing, 36 C.F.R. § 211.28(c), although he may do so in his discretion.

38. Even if the Secretary had elected not to hold an evidentiary hearing, the issues would have been crystalized to a certain extent.

The Forest Service Manual (1966) § 1577.3 provides:

"Any person who is adversely affected by a decision of the Chief in a * * * class three appeal may take an appeal to the Secretary by filing with the Chief a written notice of appeal and statement of reasons prepared in accordance with the procedure provided in Section 211.21. Upon receipt of the notice and statement, the Chief shall prepare his own statement setting forth the facts and circumstances upon which his decision was based and shall transmit his statement and the record to the Secretary."

Under 36 C.F.R. § 211.21 the appellant submits to the Secretary:

"* * * a written statement setting forth the reasons why the decision appealed from is contrary to, or in conflict with, the facts, the law, or the regulations of the Secretary of Agriculture, hereinafter referred to as the 'Secretary' or is otherwise in error."

38a. Although the challenged permit to use the Echo Cove mill site and the "Conditions of Use", which would lead to the issuance of a patent following construction of the mill and other manufacturing facilities if its conditions were performed, were issued after the institution of this action, the contract signed in 1968 was quite specific in regard to the mill requirement as a condition of the contract. Timely administrative protest would have raised many, if not all, of the issues concerning the propriety of permitting use of national forest land for such industrial ventures. The challenge under the National Environmental Policy Act of 1969, 42 U.S.C.A. §§ 4321-4347 (Supp. 1971), raises issues concerning the appropriateness of locating the mill on Echo Cove. While plaintiffs ad-

## VIII. Marketing procedures.

Plaintiffs contend that the marketing procedures employed by the Forest Service were defective in the following respects:

(a) The private sale to U.S.P. in 1968 at the same price established by the 1965 competitive bids despite evidence of a dramatic increase in stumpage prices was an abuse of discretion;

(b) The primary manufacture and mill requirements imposed by the Forest Service diminished the fair market value of the timber in violation of 16 U.S.C.A. § 476 (1960) and 36 C.F.R. § 221.7(a) (1970).

### (a) The private offering

■■■ The Act of June 4, 1897, 16 U.S.C.A. § 476 (1960) authorizes the Secretary, under rules and regulations prescribed by him, to sell national forest timber for *not less than appraised value* after advertisement and opportunity for public bidding. Although the Act of 1897 refers only to appraised value, the Secretary's regulations state that the object of appraisal is to establish fair market value. 36 C.F.R. § 221.7(a) (1970).[39] The Act of 1897 goes on, however, to provide for an exception to the general advertisement and bidding requirements:

"In cases in which advertisement is had and no satisfactory bid is received, or in cases in which the *bidder fails to complete the purchase*, the timber may be sold, without further advertisement, *at private sale*, in the *discretion of the Secretary* of Agriculture, at not less than the appraised valuation, in quantities to suit purchasers." 16 U.S.C.A. § 476 (1960). (Emphasis added).

mit knowledge of U.S.P.'s 1969 investigation of Echo Cove as a mill site, no cause of action arose under the Act until the federal government took action. As the permit and subsequent application for patent were not approved until after this suit was instituted, an administrative protest would have involved considerable

36 C.F.R. § 221.10(c) (1970) spells out the Secretary's authority in greater detail:

"(c) If the highest bid is not accepted and the sale is still deemed desirable, all bids may be rejected and the timber readvertised; or, *if the highest bidder cannot meet the requirements under which the timber was advertised* or the withholding of award to him is based on one or more of subparagraphs (4), (5), and (6) of paragraph (a) of this section *award at the highest price bid may be offered to the next highest qualified bidder* or to the other qualified bidders in order of their bids until the award is accepted by one or refused by all of the qualified bidders." (Emphasis added).

36 C.F.R. § 221.12 (1970) further provides:

"Forest Officers may sell, within their authorization, without further advertisement, at not less than the appraised value, in quantities to suit purchasers, any timber previously advertised for competitive bids but not sold because of lack of satisfactory bids and any timber on uncut areas included in a *contract which has been terminated by abandonment, cancellation, contract period expiration*, or otherwise if such timber would have been cut under the contract." (Emphasis added).

■■■ It is clear from the regulations quoted above that in the normal course of business the Forest Service has authority to resell timber without further bidding where there has been a default or failure to accept by the highest bidder. While a change in market price does not automatically require a second round of bidding, it is nonetheless con-

delay in the trial. Since the challenge involved primarily questions of law, the court made a de novo determination of the issues raised.

39. See note 5 *supra* for method of calculating appraised valuation.

ceivable that there could be a situation in which the change in market price was so dramatic that sale at the price established in the original round of bidding could only be described as arbitrary. Such is not the case in this proceeding. While plaintiffs point to some evidence of a sharp increase in prices, it is not sufficient to overcome the testimony of Forest Service officials who reviewed the 1965 bid price prior to the 1968 resale and actually found a decrease in fair market value. The refusal of St. Regis to consummate the timber contract less than a year before U.S.P. accepted the Forest Service's offer is the most convincing proof against any dramatic increase in value in the interim between the initial round of bidding in 1965 and the ultimate execution of the contract in 1968.

(b) *The primary manufacture and mill requirements.*

Defendants stipulated that the imposition of the contract requirements that the successful bidder construct a mill and perform primary manufacture within the State of Alaska reduced the price which prospective purchasers were willing to bid. Plaintiffs argue that these conditions violate the requirement that timber be sold only for fair market value and inject an impermissible consideration—the economic development of Alaska—into the Secretary's decision to sell public timber. They reason that the purposes for which the national forests may be administered are narrowly defined by the Act of 1897, 16 U.S.C.A. § 475 (1960), the Multiple Use—Sustained Yield Act, 16 U.S.C.A. § 528 (Supp.1970) and the Wilderness Act of 1964, 16 U.S.C.A. § 1131(a) (Supp.

1970). Under these Acts five basic purposes of national forest administration are articulated, to wit: (1) outdoor recreation, (2) range, (3) timber production to supply a continuous supply of timber for the use and necessities of the United States, (4) watershed protection and (5) wildlife and fish preservation.

While conceding, as a general principle, that the Secretary "could not make rules and regulations for any and every purpose," United States v. Grimaud, 220 U.S. 506, 522, 31 S.Ct. 480, 485, 55 L.Ed. 563 (1911),[40] his long-standing interpretation of the statutory scheme which has been committed to his administration is entitled to great deference. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).[41]

The Act of 1897 states that the Secretary of Agriculture may appraise and sell such quantities of national forest timber as he shall determine:

"[T]o be used in the State or Territory in which such timber reservation may be situated, respectively, *but not for export therefrom.*"

In 1917 the following provision, now codified in 16 U.S.C.A. § 491 (1960), was added to the basic statute:

"The Secretary of Agriculture may, in his discretion, permit timber and other forest products cut or removed from the national forests to be exported from the State or Territory in which said forests are respectively situated."

This grant of discretion to the Secretary was repeated in departmental appropriation acts from 1917 to 1926.

---

40. The General Counsel of the Department of Agriculture has concluded that the Secretary has authority, under appropriate circumstances, to "require that timber cut and removed from the national forest be processed to at least some degree in a particular place or area, provided such requirement reasonably relates to the furtherance of the purposes for which the national forests were created and to the protection, management and utilization of

the timber thereon." (Op.Gen.Coun. No. 126) (December 31, 1964).

41. The fact that Congress has, in isolated instances, given express authorization to manage certain forest lands for the economic benefit of local communities does not vitiate this result. *See* 16 U.S.C.A. §§ 583–583i (1960) and 43 U.S.C.A. § 1181a (1964).

Since 1926 the following provision has been in effect:

> "Timber lawfully cut on any national forest, or on the public lands in Alaska, may be exported from the State or Territory where grown if, in the judgment of the Secretary * * * the supply of timber for local use will not be endangered thereby, and the respective Secretaries concerned are authorized to issue rules and regulations to carry out the purposes of this section." 16 U.S.C.A. § 616 (1960).

Thus, as of 1926, timber cut from national forests in Alaska could not be exported from the State where it was located *unless* the Secretary in his discretion affirmatively concluded that such timber could be exported without harmful results. In 1928, the Secretary exercised his discretion and permitted export from all States, but not from the Territory of Alaska. The Secretary has consistently interpreted 16 U.S.C.A. § 616 (1960) as authorizing the conditioning of export upon primary manufacture within the State of Alaska. See 36 C.F.R. § 221.25(g) (1970).[42]

Plaintiffs argue that the year to year exemptions from the anti-export provisions contained in 16 U.S.C.A. § 476 (1960) gave the Secretary unlimited discretion, whereas the Act of 1926, 16 U.S.C.A. § 616 (1960), limited the exercise of discretion to acts in furtherance of that section, which evinces a policy of free export except where the supply of timber for local use would be endangered thereby.

It is not seriously argued that the primary manufacturing requirement is necessary to preserve timber for local consumption. While there was some testimony to the effect that primary manufacture may be justified as a timber conservation measure, and therefore permissible under the Secretary's discretion to protect the national forests, 16 U.S.C. § 551 (1960),[43] the basic function of the primary processing requirement has been to foster economic development in the State of Alaska.[44]

■ The fact that the major purpose of the primary processing and mill requirements is the economic development of Alaska does not invalidate these

42. The prohibition against export of logs from Alaska originated in a 1928 memorandum from the Secretary of Agriculture W. M. Jardine. Since that date a primary processing provision has been contained in all Alaska timber sale contracts. The prohibition did not appear in published regulations prior to 1946.

43. This argument is premised on the alleged fact that more than 50 percent of the volume in practically every timber stand on the Alaska National Forests is low grade and not economically suitable for export. Clear cutting, so the argument goes, is the only sound silviculture for the over-mature stands which predominate on the commercial forest land. Local industry is essential to obtain acceptable utilization, to get cut-over areas into a satisfactory growing condition and to avoid intolerable accumulations of logging debris. The prohibition against log export from Alaska is maintained to insure the development of the needed local industry.

44. In recommending the primary processing requirement to the Secretary in 1928, Alaska Forester W. B. Greeley stated:

> "These recommendations are based on the belief that the manufacture of Alaskan timber in Alaska rather than its shipment in the raw state for manufacture elsewhere, is to the best interests of this pioneer region. The establishment of new and the expansion of existing local wood-using plants should be fostered energetically as Alaska is badly in need of more industries. Prohibiting log exports is an important step in this direction.
> *     *     *     *     *
> [I]f the unlimited export of logs is permitted from the Territory, the local development of the paper industry is likely to be retarded materially.

Greeley's recommendations were adopted by Secretary Jardine in January of 1928. Almost without exception official documents introduced into evidence, including the timber sale contracts, referred to the function of the primary processing requirement as fostering the economic development of Alaska.

provisions. 16 U.S.C.A. § 475 (1960) requires that the Secretary administer the national forests, *inter alia,* for the "use and necessities of citizens of the United States." To hold that the United States, which holds title to over 90 per cent of the land in the State of Alaska, may not consider the economic wellbeing of the residents of Alaska would be a harsh result inconsistent with the principles of cooperative federalism.[45] Moreover, the Secretary's regulations do not prohibit all export of Alaskan timber products, but merely those which have not undergone some rudimentary form of manufacture. It would seem incongruous to require the Secretary to preserve timber "for local use" and at the same time deprive him of the flexibility to condition export upon a policy designed to return some benefits to the residents of an area which is so dependent upon the harvest from extractive industries, particularly where the restrictions imposed are consistent with sound forest management practices.

■ Plaintiffs' argument with respect to the mill requirement is essentially the same as their argument concerning primary manufacture and must be rejected for similar reasons. As for the effect which these restrictions have upon the price which a prospective purchaser would be willing to bid, it is stipulated that the effect is to decrease the bid amounts. This does not do violence to the requirement of sale for not less than appraised value. All restrictions placed upon the bidder, including those designed to prevent environmental degradation, have the inevitable effect of decreasing the price bid to the federal government. Fair market value here means simply the price an informed purchaser will pay after the imposition of all lawful restraints upon the use of the land. As the primary processing and mill requirements are lawful, their imposition in no way affected the validity of the 1965 sale to St. Regis, or the 1968 award to U.S.P.

■ Having concluded that the phrase "use and necessities" does not mean consumptive use to the detriment of economic development, the court also rejects plaintiffs' contention that U.S.P.'s agreement to sell the first fifteen years of the mill's output to a Japanese concern violates 16 U.S.C.A. § 475 (1960).

IX. Failure to mark timber.

■ 16 U.S.C.A. § 476 (1960) requires that prior to sale national forest timber shall "be marked and designated, and shall be cut and removed under the supervision of some person appointed for that purpose by the Secretary of Agriculture * * *."

Plaintiffs argue that this language can only mean individual marking of trees to be cut prior to the public auction. Defendants counter by pointing out that title to the timber under the contract does not pass until the timber is cut, scaled and paid for, and consequently there is no "sale" until these operations are completed. Both positions, if carried to their extremes, would frustrate the intent of Congress to provide for multiple use of the national forests. On the one hand, pre-sale marking of individual trees would be so onerous that only isolated sales on small tracts could be made. On the other hand, the worst forms of depredation could be validated by the *ex post facto* designation and marking at the mill site.

Under the contract, which contemplates continuing cooperation between the Forest Service and U.S.P., blocks of timber are "designated" every five years in conformity with the overall plan for utilization of the forest. Provision is also made for withdrawal of lands set aside for recreational, conservational or aesthetic purposes. In such areas logging practices are modified and "designa-

---

45. Plaintiffs' contentions that these requirements impose an impermissible burden upon commerce are not persuasive because Congress has plenary power to regulate interstate commerce. *See, e. g.* Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964).

tion of individual trees for cutting may be done by agreement between Purchaser and Forest Service." Thus the contract appropriately provides general overall supervision and periodic review with closer scrutiny and direction in particularly sensitive areas. This procedure provides adequate protection against indiscriminate cutting and satisfies the purpose of the above quoted section.

## X. Issuance of a permit for the mill site.

■ Plaintiffs attack the issuance by the Forest Service on April 24, 1970 of a 201.22 acre permit for the construction and operation of the mill at Echo Cove on the ground that it violates the 80 acre limitations on permits set forth in 16 U.S.C.A. § 497 (1960) and 48 U.S.C.A. § 341 (1952). This issue has been mooted by the withdrawal of the permit in favor of "Conditions of Use" pending the completion of the mill and the issuance of a patent to the land. While there may be some question as to the validity of a 200 acre use permit,[46] it is clear that the Secretary may convey title to land without acreage restrictions in connection with the processing of Tongass National Forest timber. Act of August 8, 1947, H.J.Res.205, Pub.L. No. 385, 61 Stat. 920, as amended by Act of June 11, 1960, Pub.L. No. 86-509, 74 Stat. 205. While the distinction between patent and permit [47] may be insignificant in many instances, the choice of methods is vested in the Secretary and may not be disturbed absent a clear showing of abuse of discretion.

## XI The Multiple Use—Sustained Yield Act.

The Tongass National Forest constitutes the bulk of the land area of Southeastern Alaska. There are 16,016,000 acres in the Tongass National Forest of which approximately 4,555,000 are commercial forest lands. As of February 6, 1958, only %oths of 1% of these commercial forest lands were reserved from logging. The Multiple Use Management Guide for the Alaska Region, April 1964, ¶ 213.1 states:

"About 95% of the commercial forest land of Southeastern Alaska is occupied by overmature * stands of hemlock, spruce and cedar. Silviculturally, these decadent stands should be removed by clear-cutting methods as soon as possible to make way for new stands of fast growing second growth timber."

As part of the policy of liquidation of the old-growth forests in Southeastern Alaska, the Juneau Unit Sale was made.

■ The Multiple Use-Sustained Yield Act, 16 U.S.C. §§ 528–531 (Supp. 1970) provides five basic purposes for which the national forests are to be administered, to-wit: (1) outdoor recreation, (2) range, (3) timber, (4) watershed, (5) wildlife and fish purposes. The definitions of "multiple use" and "sustained yield" are set forth in § 531:

"As used in sections 528–531 of this title, the following terms shall have the following meanings: (a) 'Multiple use' means: The management of all the various renewable surface resources of the national forests so

---

46. The Ninth Circuit reversed a district court temporary restraining order granted on the basis of a similar alleged permit violation stating that: "We find little or no likelihood of success in opposing the proposed development upon the ground that there would be an illegal use of term and revocable permits." Sierra Club v. Hickel, 433 F.2d 24 (9th Cir. 1970).

47. 48 U.S.C.A. § 341 (1952) and the Tongass Timber Resolution were passed al-

most simultaneously, indicating a Congressional intent to provide alternate methods of locating industrial sites on the Tongass National Forest.

* Maturity is defined as follows: "For a given species or stand, the approximate age beyond which growth falls off or decay begins to increase at a rate likely to assume economic importance."

that they are utilized in the combination that will best meet the needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; that some land will be used for less than all of the resources; and harmonious and coordinated management of the various resources, each with the other, without impairment of the productivity of the land, with consideration being given to the relative values of the various resources, and not necessarily the combination of uses that will give the greatest dollar return or the greatest unit output. (b) 'Sustained yield of the several products and services' means the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the national forests without impairment of the productivity of the land.''

Plaintiffs introduced substantial testimony as well as documentary evidence, much of it in the form of offers of proof, to show that the Tongass National Forest is being administered predominantly for timber production. While the material undoubtedly shows the overwhelming commitment of the Tongass National Forest to timber harvest objectives in preference to other multiple use values, Congress has given no indication as to the weight to be assigned each value and it must be assumed that the decision as to the proper mix of uses within any particular area is left to the sound discretion and expertise of the Forest Service. Accordingly, evidence was admitted only for the purpose of showing that the Forest Service failed to give consideration [48] to any of the competing uses or that it took into consideration irrelevant matters which it should not have considered. Plaintiffs' parade of expert witnesses might have swayed the decision of the Forest Service or influenced the result in this case had it been properly presented at an administrative proceeding. Introduced as non-record evidence in this proceeding, however, it utterly fails to impeach the record provided by the Forest Service by showing that the administrative decision makers either lacked actual knowledge or failed to consider the myriad reports and studies available to them. The court must presume, therefore, that the Forest Service did give due consideration to the various values specified in the Multiple Use-Sustained Yield Act. Having investigated the framework in which the decision was made, the court is forbidden to go further and substitute its decision in

48. The Act requires that the Forest Service give "due" consideration to the various competing uses. Plaintiffs argue that "due" could only mean "equal." This interpretation would seem to be precluded by the language of § 531, which clearly contemplates that some areas may be unsuited to utilization of all resources. "Due" is impossible to define and merely indicates that Congress intended the Forest Service to apply their expertise to the problem after consideration of all relevant values. In the absence of a more satisfactory or objective standard the court considered that evidence in the record of "some" consideration was sufficient to satisfy the Act absent a showing that no actual consideration was given to other uses.

Professor Reich comments on the breadth of the Multiple Use-Sustained Yield Act of 1960 in a paper entitled "Bureaucracy and the Forests" (copyright The Fund for the Republic, Inc., Center for the Study of Democratic Institutions at Santa Barbara, California), as follows:

"The standards Congress has used to delegate authority over the forests are to general, so sweeping, and so vague as to represent a turnover of virtually all responsibility. 'Multiple use' does establish that the forests cannot be used exclusively for one purpose, but beyond this it is little more than a phrase expressing the hope that all competing interests can somehow be satisfied and leaving the real decisions to others."

a discretionary matter for that of the Secretary.[49]

## XII. The Wilderness Act.

■ Plaintiffs allege that "much of the area of the sale is of wilderness character sufficient to qualify as wilderness under the 1964 Wilderness Act, 16 U.S. C. § 1131, et seq."

The Wilderness Act of 1964, 16 U.S.C. §§ 1131–1136 (Supp.1970) created, as of September 3, 1964, a National Wilderness Preservation System. On that date all areas of national forests which had *previously been designated* by the Secretary of Agriculture or the Chief of the Forest Service as "wilderness," "wild," or "canoe" areas were designated "Wilderness Areas." 16 U.S.C.A. § 1132(a) (Supp.1970). The Act further provides that the National Wilderness Preservation System could be expanded during the 10-year period following September 3, 1964, by the inclusion of such "primitive areas" as had been so designated *as of September 3, 1964.* 16 U.S.C.A. § 1132(a) (Supp.1970). The Secretary was also instructed to review certain inaccessible areas within the national park system, the national wildlife refuges and game ranges for possible inclusion with-

in the system. 16 U.S.C.A. § 1132(c) (Supp.1970). This is the only exception to the rule that eligible land had to be designated before the effective date of the Act. The Act expressly provides that "no Federal lands shall be designated as 'wilderness areas' except as provided for in this chapter or by subsequent Act." 16 U.S.C.A. § 1131(a) (Supp.1970). Since there were no "primitive" areas in Alaska on September 3, 1964, and it does not appear that the sale includes any land within a national park, wildlife refuge or game range, the Wilderness Act has no application here.

## XIII. The National Environmental Policy Act of 1969.

■ Plaintiffs challenge the action of the Secretary in approving the Echo Cove mill site on the ground that he failed to comply with the mandatory reporting provisions of the National Environmental Policy Act of 1969 (hereinafter referred to as N.E.P.A.) 42 U.S.C.A. §§ 4321–4347 (Supp.1971). N.E.P.A. requires federal agencies to submit detailed environmental impact statements prior to the initiation of major actions which may have a significant impact on the human environment.[50]

---

49. The Forest Service had at its disposal a number of highly technical studies covering a broad range of possible use alternatives. A great deal of expertise went into the composition of Multiple Use Plan for the Chatham Ranger District, which was referred to in drawing up the timber sale contract. The contract itself contains a number of provisions relating to environmental safeguards, including a provision allowing the Forest Service to exempt up to 800,000 acres within the sale area from cutting.

50. Section 102 (42 U.S.C. § 4332) of the Act reads in relevant part as follows:

The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall—

(A) utilize a systematic, interdisciplinary approach which will insure the in-

tegrated use of the natural and social sciences and the environmental design arts in planning and in decisionmaking which may have an impact on man's environment;

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations;

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

Although N.E.P.A. became effective on January 1, 1970, the term "major federal action" was not clarified until April 30, 1970, when the Council on Environmental Quality published its interim guidelines including all entitlements to use federal land in that category.[51] Although the Forest Service had already issued a use permit for the Echo Cove area dated April 15, 1970, the Secretary went through the formalities on June 25, 1970 of transmitting a letter to cabinet members and other federal officials requesting their comments. A hastily compiled impact statement was actually forwarded to the Council on August 12, 1970, one day before the Service issued its "Conditions of Use" pending the patent of the Echo Cove site to U.S.P.

Because of the Secretary's action, the court will assume that N.E.P.A. was applicable to the granting of the mill site permit.[52] However, it appears under the

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes;

(D) study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources.

51. 5. *Actions included.* The following criteria will be employed by agencies in deciding whether a proposed action requires the preparation of an environmental statement:

(a) "Actions" include but are not limited to:

(i) Recommendations or reports relating to legislation and appropriations;

(ii) Projects and continuing activities;

—Directly undertaken by Federal agencies;

—Supported in whole or in part through Federal contracts, grants, subsidies, loans, or other forms of funding assistance;

—Involving a Federal lease, permit, license, certificate or other entitlement for use;

(iii) Policy—and procedure-making.

(b) The statutory clause "major Federal actions significantly affecting the quality of the human environment" is to be construed by agencies with a view to the overall, cumulative impact of the action proposed (and of further actions contemplated). Such actions may be localized in their impact, but if there is potential that the environment may be significantly affected, the statement is to be prepared. Proposed actions the environmental impact of which is likely to be highly controversial should be covered in all cases. * * * 35 Fed.Reg. 7390 (1970).

52. Defendants argue that the granting of the permit was not a major federal action requiring compliance with N.E.P.A. There are, as of this date, no reported decisions construing the phrase "major federal action," and the few unreported decisions made available to this court provide little guidance. In perhaps the most widely publicized action involving N.E.P.A. the U. S. District Court for the District of Columbia enjoined the construction of the Alaska Pipeline pending compliance with the Act. Wilderness Society v. Hickel, 325 F.Supp. 422 (D.D.C.1970). In a somewhat less obvious case, the U. S. District Court for the District of Arizona preliminarily enjoined the Corps of Engineers from channel clearing work on the Gila River in Arizona on the ground that such work was a "major federal action" requiring compliance with N.E.P.A. prior to initiation of the project.

Defendants also contend that the Council's interim guidelines are utterly unworkable and would require substantial delays before even the most innocuous project involving use of federal lands could be approved and that this would contravene the intent of Congress in passing N.E.P.A.

circumstances the Act was complied with "to the fullest extent possible." *See* 42 U.S.C.A. § 4332 (Supp.1971). Prior to the enactment of N.E.P.A., U.S.P. had expended substantial sums to insure that the impact of the mill would be minimized by comprehensive site planning and the most advanced technology available. The mill site selection was supervised by a blue-ribbon panel of conservationists selected from universities in the United States and Canada.[53] A specially commissioned field study sponsored by U.S.P. resulted in a seventy page technical report published in November of 1969 by the Institute of Marine Science of the University of Alaska. It seems unlikely that an investigation by federal experts would have been more comprehensive or unbiased.

In the response received by the secretary prior to the submission of the Environmental Impact Statement, the Department of Housing and Urban Development described pulp mills as "among the worst installations in terms of adverse impact on both natural and human environments." Letter from Deputy Under Secretary Charles J. Orlebeke to Secretary Clifford M. Hardin, July 24, 1970. Evidence at the hearing indicated that the effluents from the mill will contain a biological oxygen demand equivalent to the untreated sewage of a city larger than Juneau and that smoke emissions into the atmosphere will reach the level of 250 pounds of sulphur per day.

The record evidence indicates that the pulp mills located near Sitka and Ketchikan, Alaska, which are not unbleached Kraft type mills, and which have been in existence for a number of years, have had only slight impact locally on the quality of human environment, and that the overall cumulative effect on the quality of human environment has not been significant. Moreover, defendants presented evidence which indicates that rapid strides have been made in the technology of pulp mill pollution control and that the unbleached Kraft type mill under consideration has been rendered relatively innocuous. Accepting this evidence at its face value, it nevertheless goes to the merits of the impact statement, not the threshold question of whether the N.E.P.A. reporting requirements are applicable. While it may be possible in the future to develop some *per se* categories of major federal actions, past experience with pulp mills dictates that for the present complete investigation of the impact of individual mills will continue to be appropriate.

Defendants also argue that the permit issued in April of 1970 and the "Conditions of Use" issued in August of 1970 merely formalized and ratified an informal agreement between the United States and U.S.P. which had been reached as early as December 1969.

The rule that N.E.P.A. should not be given retroactive effect to frustrate activities to which the Government had committed itself prior to the passage of the Act is, in principle, sound. *See* Pennsylvania Environmental Council, Inc. v. Bartlett, 315 F.Supp. 238 (M.D.Pa.1970); Brooks v. Volpe, 319 F.Supp. 90 (W.D. Wash.1970); Investment Syndicates, Inc. v. Richmond, 318 F.Supp. 1038 (D.Ore. 1970). The difficult question involves pinpointing that moment in time when the federal government can be said to have committed itself. In Brooks v. Volpe, *supra*, the court held the Act was inapplicable to an administrative decision made in 1967, two years prior to the passage of N.E.P.A. In Investment Syndicates, Inc. v. Richmond, *supra*, the court held the Act inapplicable where federal funds for expanding a power project had been appropriated and land had already been condemned (although construction had not yet been started) at the time of the Act's passage. While it is true that U.S.P. had expended considerable sums of money investigating the Echo Cove mill site and had definitely decided to use that location prior to the effective date of N.E.P.A., the Act speaks to the federal government, not individuals doing business with the government. Prior to April 24, 1970, when the first use permit was issued, neither party was bound to construct the mill at Echo Cove. It was the granting of the permit in that location which constituted a major federal action, and as the permit was granted after January 1, 1970, N.E.P.A. was applicable. Indeed, the Secretary so interpreted the Act and went through the motions of compliance.

53. The panel consisted of Dr. Donald J. Zinn, professor of zoology, University of Rhode Island; Dr. R. Van Cleve, dean of the College of Fisheries, University of Washington; Dr. A. Starker Leopold, professor of forestry and zoology, University of California; Dr. Stanley Cain, professor of natural resources, University of Michigan; Dr. Ian McTagart, dean of graduate studies, University of British Columbia.

Considering the impressive credentials of the U.S.P. panel of environmental experts assigned to the project, the high quality of its research product, the advanced stage of planning as of January 1, 1970, and the exhorbitant cost of any further delay, the Forest Service was justified in its reliance upon U.S.P.'s environmental studies. Nothing in this opinion should be construed as implying that the procedures followed by the Forest Service in its efforts to comply with N.E.P.A. in this case will be found acceptable in the future under circumstances where it is fair to impute notice of the Act's provisions to all parties at or before the time a major federal project is conceived.

## XIV. Laches.

In good faith reliance upon its agreement with the United States entered into on February 6, 1968, defendant U.S.P. expended $145,750.00 between May 1968 and September 12, 1968, investigating the contemplated purchase. In good faith reliance upon its formal contract of that date, and without knowledge of any claims that the contract was invalid, defendant U.S.P. commenced performance. Prior to the filing of this action in February of 1970, U.S.P. had expended over two million dollars, including $100,000 spent prior to December 15, 1969 investigating the suitability of the Echo Cove—Berners Bay mill site.

The sale in 1968 and mill site investigations in 1969 received wide publicity, and plaintiffs do not deny that they had knowledge of those events at the times of their occurrence. Despite their admitted knowledge of all these actions, plaintiffs did not institute this action until February 10, 1970—apparently in the unfounded hope that U.S.P. would fail to consummate the contract in the same fashion as its predecessors, St. Regis in 1965 and Georgia Pacific in 1955. Plaintiffs' failure to take timely action in asserting their claims exacerbated the reasonably foreseeable financial consequences to U.S.P. In the absence of any justification for this unreasonable delay, the court holds that all causes of action except the one based upon alleged violations of the National Environmental Policy Act of 1969, which did not become law until January 1, 1970, are barred by the doctrine of laches. *See* Gandt v. Hardin, Civil No. 1334 (W.D.Mich., filed December 11, 1969); Triangle Improvement Council v. Ritchie, 314 F.Supp. 20 (S.D.W.Va. 1969). *See generally* 27 Am.Jur.2d, Equity § 162 (1966).

## CONCLUSIONS

1. Plaintiffs have standing to maintain this action. The Sierra Club and The Sitka Conservation Society have standing to represent the interests of their members who will suffer direct and obvious injury to their aesthetic, conservational and recreational values.

2. The decisions of the Secretary made pursuant to his authority to administer the public domain under 16 U.S.C.A. §§ 475, 476, 497, 528–529, 1131–1136 are subject to judicial review. 5 U.S.C.A. § 702 (1967).

3. Plaintiffs have failed to exhaust their administrative remedies.

4. The timber sale to U.S.P. in 1968 at the same price bid by St. Regis in 1965 was not an abuse of discretion. 16 U.S.C.A. § 476 (1960).

5. The primary manufacture and mill construction requirements contained in the contract are lawful and their imposition does not violate the requirement of sale for fair market value. 16 U.S. C.A. §§ 475, 551, 616 (1960).

6. The contract requirements for designation and marking of timber satisfy the requirements of 16 U.S.C.A. § 476 (1960).

7. The Secretary has authority to patent land within the Tongass National Forest for use in processing timber harvested from the forest. Act of August 8, 1947, H.J.Res. 205, Pub.L.No. 80–385, 61 Stat. 920, *as amended* by Act of June 11, 1960, Pub.L. 86–509, 74 Stat. 205.

8. The record indicates that the Secretary gave due consideration to all the

use values enumerated in the Multiple Use—Sustained Yield Act prior to offering the timber for sale. 16 U.S.C.A. §§ 528–537 (Supp.1970).

9. The Wilderness Act is inapplicable to the lands subject to the Juneau Unit timber sale. 16 U.S.C.A. § 1131(a) (Supp.1970).

10. The issuance of a use permit or patent to the Berners Bay—Echo Cove mill site was a "major federal action" within the meaning of the National Environmental Policy Act of 1969. 42 U.S.C.A. § 4332 (Supp.1971).

11. The Forest Service was justified in relying on the environmental impact investigation conducted by U.S.P., and under the circumstances the Act was complied with to the "fullest extent possible." 42 U.S.C.A. § 4332 (Supp.1971).

12. Plaintiffs had contemporaneous knowledge of all events leading to the timber sale and the issuance of entitlements to use the Berners Bay—Echo Cove mill site. They were also on notice of the substantial expenditures which U.S.P. was making in performance of the timber sale contract. In the absence of any justification for the delay in instituting this action, the suit is barred by the doctrine of laches.